## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 30 2016, 8:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR FATHER

Thomas G. Krochta
Evansville, Indiana

ATTORNEY FOR MOTHER

Erin L. Berger
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of A.S & L.S. (Minor Children) and M.S. (Mother) & J.S. (Father), <br><br> *Appellants-Respondents,* <br><br> v. <br><br> The Indiana Department of Child Services, <br><br> *Appellee-Petitioner* | August 30, 2016 <br><br> Court of Appeals Case No. 82A01-1601-JT-210 <br><br> Appeal from the Vanderburgh Superior Court <br><br> The Honorable Brett J. Niemeier, Judge <br><br> Trial Court Cause Nos. 82D04-1508-JT-1521 82D04-1508-JT-1522 |

**Mathias, Judge.**

[1] M.S. ("Mother") and J.S. ("Father") appeal the involuntary termination of their parental rights to minor sons A.S. and L.S. (collectively "the Children"). Mother and Father separately raise one issue, which we restate as whether the Department of Child Services ("DCS") presented sufficient evidence to support the trial court's termination order.

[2] We affirm.

## Facts and Procedural History

[3] Mother and Father are the biological parents of L.S., born on January 2, 2004 and A.S., born on May 26, 2008. On April 1, 2014, DCS filed petitions alleging that the Children were children in need of services ("CHINS") based on a domestic violence incident that occurred on March 19, 2014, which led to Father's arrest and subsequent incarceration. That same day, Mother admitted that the Children were CHINS and Father stipulated to the evidence on April 22, 2014. After Father's stipulation, the trial court adjudicated the Children as CHINS and ordered him to contact family case manager, Dawn Moore ("Moore") within twenty-four hours of being released from incarceration.

[4] During the domestic violence incident, Father was drunk, threatened and scratched Mother with a knife, and then trashed the house. This all occurred while the Children were upstairs asleep. At this time, the Children were staying with Mother.

[5] On April 16, 2014, Mother was charged with possession of a controlled substance and driving as a habitual traffic violator. The court set a dispositional hearing in the CHINS cases for April 29, 2014, at which Mother failed to appear. As a result, the trial court ordered the Children to be removed from Mother's care and placed in foster care and then issued a bench warrant for Mother. The next day, the court determined that the Children's detention was necessary due to Mother's incarceration.

[6] On May 7, 2014, the trial court held a dispositional hearing, took the petition for parental participation under advisement, and ordered Mother to participate in visitation with the Children. Another hearing was held on July 2, 2014, and the trial court ordered Mother to participate in parent aide services, receive a substance abuse evaluation, participate in parenting education classes, remain drug and alcohol free, and submit to random drug screens. The trial court took the domestic violence counseling under advisement but it was later stricken from Mother's parental participation agreement on July 30, 2014. That same day, the trial court ordered Father to submit to random drug screens. The court later modified its parental participation order to Father on January 28, 2015, and ordered him to cooperate with the parent aide program, obtain a substance abuse evaluation and follow recommended treatment, attend outpatient substance abuse program, participate in visitation, remain drug and alcohol free, and attend domestic violence classes.

[7] Shortly after the Children were removed, Mother went on a binge because it was her birthday. She admitted that she partied and did drugs for about one

month. On May 7, 2014,[1] Mother tested positive for methamphetamine, hydrocodone, oxycodone, and THC. Mother also failed to comply with drug screens, and the family case manager Moore did not know Mother's location from July 2014 until April 2015. Mother failed to attend the DCS referred substance abuse treatment classes and stopped visiting the Children on July 10, 2014, because she was "on the run" from police due to warrants for her arrest. Tr. p. 32. Before that, Mother visited the Children seven times between May and July 2014, but cancelled twice and did not show up five times. Mother also did not complete the parent aide services or the parenting classes, and her home remained in a deplorable condition with "huge mounds of dog feces" in numerous rooms and no electricity. Tr. p. 91.

[8] Mother was arrested on a bench warrant on March 9, 2015. She was released on bond, but was arrested several more times between April and September 2015 for failure to appear in court. On March 26, 2015, Mother admitted to violating probation and was sentenced to concurrent two year terms served at Vanderburgh County Community Corrections ("VCCC"), a local work release facility.[2] On April 21, 2015, the trial court determined that Mother was incarcerated and awaiting sentencing and Father had missed numerous drug screens and visitation with the Children. The court also approved concurrent

---

[1] This was the same day as the dispositional hearing.

[2] Mother violated probation twice for bringing illegal substances and testing positive for alcohol while at VCCC. Mother's App. p. 27.

permanency plans of reunification and adoption. In May 2015, Mother requested visitation with the Children, but the request was denied based on the recommendations of the Children's therapists.

[9]     Like Mother, Father failed to complete court ordered substance abuse treatment, failed to attend numerous drug screens, and twice failed to complete "parenting belief" classes. Throughout the CHINS cases, Father tested positive for alcohol even though he had been ordered to remain drug and alcohol free. Father visited the Children for a brief period at the beginning of the CHINS cases and three times between March and May 2015. However, between August 2014 and March 2015, Father did not visit or inquire about visiting the Children.

[10]    On August 28, 2015, DCS filed petitions for termination of parental rights concerning both children. On September 21, 2015, the trial court changed the permanency plan to termination of parental rights and adoption. The trial court then held an evidentiary hearing on DCS's termination petitions on November 12, 2015.[3]

[11]    Mother admitted to being involved with DCS on two prior CHINS cases.[4] She acknowledged that she had active warrants at this time and had drug issues as

---

[3] Father was incarcerated at the time of the evidentiary hearing on felony intimidation and operating while intoxicated convictions with an anticipated release date of August 5, 2016. Mother was incarcerated at VCCC with an anticipated release date of February 2016.

[4] One of the cases involved an older daughter and the other case involved the Children in 2011 due to Mother and Father's substance abuse issues.

well. Mother also stated that she stopped visiting the Children and contacting DCS after being released on bond because she was afraid that family case manager Moore would turn her into the police because she was "on the run." Tr. p. 32. Even though she was not visiting the Children, Mother testified that she took a trip to Kings Island with her aunt and aunt's two children while she was out on bond. Mother also acknowledged that she has a criminal history involving substance abuse.[5] She admitted that her driver's license has been suspended for life but explained that "there are ways around that now." Tr. p. 45.

[12] Although Mother admitted she has struggled with substance abuse in the past and did not remain drug and alcohol free during the CHINS proceedings, she is now sober and working since being incarcerated. Mother also reported receiving substance abuse treatment from Counseling for Chance and attending Alcoholics Anonymous meetings.

[13] Father admitted to continued substance abuse issues that started in 2009. During the CHINS proceedings, Father stated that he drank more than five drinks two to three times per week, which resulted in failed drug screens. Father also discussed his criminal history, which again like Mother's is linked to

---

[5] In December 2011, Mother was convicted of Class C misdemeanor operating a motor vehicle while intoxicated ("OWI"), OWI in a manner that endangers person, and OWI with a controlled substance in body. In February 2014, Mother was convicted of Class A misdemeanor driving while suspended, Class C misdemeanor OWI, and Class B misdemeanor public intoxication, endangering a person's life. In August 2014, Mother was convicted of Class D felony possession of a controlled substance and Class D felony operating a vehicle as a habitual traffic violator.

substance abuse.[6] Father visited the children until he bonded out of jail. Then he stopped the visits because he ran from the police until he was arrested again. Father admitted that he is not currently in a position to parent the Children but asked the court to give Mother another chance. Tr. p. 80. Father then alleged that the court system had failed him and Mother for being too lenient in sentencing and that if they were incarcerated sooner it would have "open[ed] our eyes." Tr. p. 81.

[14] Family case manager Moore has known Mother and Father since the beginning of the 2014 CHINS cases. Moore testified that after Mother failed to show up for the dispositional hearing that she visited her home.[7] Moore found the home trashed. There was food caked on the stove, trash piled up everywhere, and dog feces all over the floor. Tr. p. 90. Moore discovered Mother hiding in the shower, fully clothed, and trying to avoid being detected. When Moore returned to Mother's home three months later, the house was in even worse condition with no electricity. Further, Moore stated that Mother stopped visiting the Children in July 10, 2014, did not complete the parent aide services, and did not attend the substance abuse counseling or "parenting belief" classes.

---

[6] On May 20, 2014, Father pleaded guilty to Class D felony intimidation and Class A misdemeanor invasion of privacy based on the domestic violence that led to the Children's removal. Father was drunk at the time of this incident. However, the court withheld judgment on each count and placed Father on probation. In December 2014, Father pleaded guilty to Class B misdemeanor public intoxication and served ten days in jail. In May 2015, Father was arrested and charged with Level 6 felony OWI with a prior conviction.

[7] Mother and Father lived at the same home, even though they are separated.

Moore stated that Father also was ordered to participate in numerous services including a substance abuse evaluation. However, Father never completed it.

[15]     Moore also stated that Mother requested visitation with the Children in May 2015. The request was denied based on the recommendations from the Children's therapists. Moore stated that "the Children had moved on with their lives," had made tremendous progress, and never asked to visit with Mother. Tr. p. 94. Moore testified that termination is in the Children's best interests because they need permanency and have waited long enough. Moore also stated that Mother has been involved with three CHINS cases in the past and will return to the same behaviors and lifestyle. She also testified that Mother had eight months prior to being incarcerated to visit the Children but put her own needs first to go on a drug binge for her birthday. Tr. p. 95. Moore stated that the Children need a family who they can count on, will take care of them, and will meet all of their needs. Moore had no doubt that she would find a pre-adoptive placement for the Children.

[16]     Although CASA Ed Derringe ("CASA Derringe") was not available to testify at the evidentiary hearing, he submitted a report that was considered by the court. Appellee's App. pp. 2-4. Like family case manager Moore, CASA Derringe also concluded that termination of Mother and Father's parental rights was in the Children's best interests. CASA Derringe first met with Mother and Father in May 2014. They stated that they would "do anything" to get their kids back, but when DCS told them that they needed to submit to drug testing and parenting classes they said "[there's] no way we're doing that." *Id.*

at 3. CASA Derringe observed that Mother and Father have made no effort in the past year and a half to get their children back. Mother had not visited the Children in over a year and Father visited the Children "seldom and sporadically." *Id.* At the visits, Father was out of touch with the Children. He asked what grades they were in at one visit and brought a puppy to another visit. CASA Derringe was concerned that Father was basically saying to the Children that he could take care of a dog but not take care of them.

[17] CASA Derringe noted that after Mother was sentenced to work release that she started asking about visits again, but after doing nothing for over one year, termination was filed. He stated that the Children were doing well in foster care and made great strides with their behaviors and studies. L.S. was almost a straight "A" student and participated in sports. A.S. still struggled with his behavior but was "light years ahead of last year." *Id.* at 4. CASA Derringe concluded that the Children had moved on with their lives after Mother and Father had been absent over the last year and a half and that "putting them back in their former situation would be a tragedy." *Id.*

[18] After taking the matter under advisement, the court entered an order terminating Mother and Father's parental rights to the Children on January 13, 2016. Mother and Father now appeal.

## Standard of Review

[19] We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App.

2011). We neither reweigh the evidence nor assess witness credibility. *Id.* We consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id.* Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Clear error is that which "leaves us with a definite and firm conviction that a mistake has been made." *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied*.

### Termination of Parental Rights

[20] "The purpose of terminating parental rights is not to punish parents but to protect their children. Although parental rights have a constitutional dimension, the law allows for their termination when parties are unable or unwilling to meet their responsibility as parents." *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004) (citation omitted). Indeed, parental interests must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009).

[21] Indiana Code section 31-35-2-4(b) provides that a petition to terminate parental rights must meet the following requirements:

> (2) The petition must allege:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

[22] However, Indiana Code section 4(b)(2)(B) is written in the disjunctive; therefore, the trial court is required to find that only one prong of subsection (2)(B) has been established by clear and convincing evidence. *In re A.K.,* 924 N.E.3d 212, 220 (Ind. Ct. App. 2010). DCS must prove "each and every element" by clear and convincing evidence. *G.Y.*, 904 N.E.2d at 1261; Ind. Code § 31-37-14-2. Clear and convincing evidence need not establish that the continued custody of the parent is wholly inadequate for the child's very survival. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). Rather, it is sufficient to show by clear and convincing evidence that the child's emotional development and physical development are put at risk by the parent's custody. *Id.* If the court finds the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

# I. Conditions that Led to Removal

[23] When making a determination as to whether a reasonable probability exists that the conditions resulting in a child's removal or continued placement outside of a parent's care will not be remedied, the trial court must judge a parent's fitness to care for her child at the time of the termination hearing while also taking into consideration evidence of changed circumstances. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156-57 (Ind. Ct. App. 2013). However, the court can "disregard the efforts . . . made only shortly before termination and to weigh more heavily [a parent's] history of conduct prior to those efforts." *In re K.T.K.*, 989 N.E.2d 1225, 1234 (Ind. 2013).

[24] The trial court is also required to consider the parent's habitual patterns of conduct in order to determine the probability of future neglect or deprivation of the child. *A.D.S.*, 987 N.E.2d at 1157. The trial court may consider evidence of a parent's prior history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* The trial court may consider the services offered to the parent by DCS and the parent's response to those services as evidence of whether conditions will be remedied. *Id.* DCS is not required to provide evidence ruling out all possibilities of change. *Id.* Instead it needs to establish only that a "reasonable probability" exists that the parent's behavior will not change. *Id.*

*A. Mother*

[25] Mother argues that the trial court erred in determining that there was a reasonable probability that she would not remedy the condition that led to the removal of the Children and their placement outside of Mother's care and custody because at the time of the termination hearing she was participating in drug treatment, was employed, was compliant with the terms of the work release program, and requested services and visitation after being incarcerated.

[26] In this situation, the Children were removed due to issues with Mother's and Father's substance abuse, Mother's and Father's criminal behavior, and Mother's and Father's non-compliance with court orders and failure to participate in services. While Mother appears to have made progress while being incarcerated, prior to incarceration Mother had an opportunity to remedy her substance abuse through a 2011 CHINS case involving the Children, failed to participate in services, failed to visit the Children, went on a month long binge of drug use because it was her birthday, failed to comply with the court's dispositional orders, ran from the police, engaged in criminal conduct, and even tested positive for alcohol during work release.

[27] In its discretion, a trial court can "disregard the efforts . . . made only shortly before termination and to weigh more heavily [a parent's] history of conduct prior to those efforts." *See In re K.T.K.*, 989 N.E.2d at 1234. The trial court acknowledged Mother's progress and weighed it accordingly. Mother's

argument here is simply a request to reweigh evidence, which is not within our role as an appellate court. *See In re D.B.*, 942 N.E.2d at 871.

*B. Father*

[28]     Like Mother, Father argues that DCS did not present sufficient evidence to support that Father would not remedy the conditions justifying removal of the Children and their placement outside of Father's care and custody. Specifically, Father contends that while he has been incarcerated, he has not had the opportunity to make substantial efforts to better his life through programs.

[29]     As previously mentioned, the Children were removed due to issues with substance abuse, Mother and Father's criminal behavior, and Mother and Father's non-compliance with court orders and failure to participate in services. Although Father claims he has not had the opportunity to participate in services in jail, he testified that at the time of the evidentiary hearing he was participating in a spiritual rehabilitation program called, "Celebrate Recovery." Tr. p. 77. Father emphasizes that he was not provided services while incarcerated. This ignores the fact that he was offered comprehensive DCS services, including substance abuse treatment and parenting classes, prior to incarceration but failed to participate in those services, failed random drug screens, and minimally visited the Children. Further, Father admitted to "[being] under the influence of alcohol throughout the [CHINS proceedings]." Tr. p. 81. Father is now sober, but he is incarcerated. He also admitted that he

was not currently in a position to parent the Children but that Mother should be given another chance. Tr. p. 80.

[30] Not only may the trial court consider a parent's fitness to care for the child at the termination hearing, but it also may consider services offered to the parent by DCS and the parent's response to those services as evidence of whether conditions will be remedied. *A.D.S.*, 987 N.E.2d at 1157. Based on these facts and circumstances, we conclude that the trial court did not err in determining that the evidence was sufficient to support the conclusion that the conditions that led to the removal of the Children would not be remedied by Father.

## II. Best Interests of the Children[8]

[31] When determining what is in the best interests of a child, the trial court must look beyond the factors identified by DCS and look to the totality of the evidence. *A.D.S.*, 987 N.E.2d at 1158. In doing so, the court must subordinate the interests of the parent to those of the child. *Id.* The court need not wait until the child is irreversibly harmed before terminating the parent-child relationship. *Id.* A recommendation by the case manager or child advocate to terminate parental rights is sufficient to show by clear and convincing evidence that

---

[8] Both Mother and Father challenge the court's determinations that continuation of the parent-child relationship would pose a threat to the well-being of the Children and that termination was in the best interests of the Children. However, their arguments are not supported by cogent reasoning as required by Indiana Appellate Rule 46(A)(8)(a). Although these arguments are waived, we will still address the best interests argument. However, we decline to address the continuation of parent-child relationship because Indiana Code section 4(b)(2)(B) is written in the disjunctive and we have already concluded that the conditions that led to removal were not remedied by either Mother or Father.

termination is in the child's best interests. *Id.* at 1158-59. Permanency is a central concern in determining the best interests of a child. *Id.* at 1159.

[32] As with her argument that the conditions that led to removal have been remedied, Mother argues that she has made progress, and therefore, it is not in the best interests of the Children to terminate her parental rights. Father also repackages his argument about remediation of the conditions that led to removal, claiming that he has not had a chance to participate in services in jail as a reason why it is not in the Children's best interests to terminate his parental rights.

[33] The Children were removed after a domestic violence situation that resulted in criminal charges for Father and then several weeks later Mother failed to attend a dispositional hearing for the Children's CHINS cases. Family case manager Moore found Mother hiding in the shower, fully clothed, when she came to notify her that the Children were being removed from her care. After the Children were removed, both Mother and Father's participation in visitation was limited. They also failed to participate in services. At the time of the termination hearing, Mother had not seen the Children in over one year and Father had not seen them since around June 2015.

[34] Both family case manager Moore and CASA Derringe expressed that termination of Mother and Father's parental rights was in the Children's best interests. Case manager Moore emphasized that Mother and Father had prior opportunities to participate in substance abuse treatment from a previous CHINS case involving the Children. Moore also noted that Mother and Father had

opportunities to participate in services before they both were incarcerated but consistently failed to do so. CASA Derringe stated that the Children are doing well in foster care and have made great strides with their behaviors and studies. He also emphasized that the Children had moved on with their lives and that "putting them back in their former situation would be a tragedy." Appellee's App. p. 4. Based on the recommendations of Moore and Derringe, we cannot conclude that the trial court erred in determining that termination of Mother and Father's parental rights to the Children was in the best interests of the Children.

## Conclusion

[35]    Mother and Father have a long history with substance abuse issues that has negatively impacted the Children. Both Mother and Father show a clear pattern of running from the police to avoid incarceration. Mother has put her own needs before the needs of the Children as evidenced by her month-long binge of drug use to "celebrate her birthday." She also failed to attend numerous court hearings regarding her criminal charges. Neither Mother nor Father participated in services or visited the Children when they had the opportunity to do so before they were incarcerated. Applying our highly deferential standard of review, we cannot conclude that the trial court's decision to terminate Mother and Father's parental rights to the Children was clearly erroneous.

[36]    Affirmed.


Robb, J., and Brown, J., concur.